**Robert SCOTT**

v.

**ZST DIGITAL NETWORKS, INC. et al.**

**No. CV 11–03531 GAF (JCx).**

United States District Court,
C.D. California.

Aug. 7, 2012.

Laurence M. Rosen, Rosen Law Firm, Los Angeles, CA, for Plaintiff.

Stephen D. Hibbard, Shearman & Sterling LLP, San Francisco, CA, Andrew J. Rodgers, Christopher R. Fenton, Edward G. Timlin, Shearman & Sterling LLP, New York, NY, for Defendants.

## ORDER RE: MOTIONS TO DISMISS

GARY ALLEN FEESS, District Judge.

## I.

## INTRODUCTION

Shareholders of ZST Digital Networks, Inc. ("ZST" or the "Company") bring this securities class action against the Company, a number of its senior officers, and its outside accountants and investment banks, alleging that Defendants' submission of conflicting financial information to American and Chinese regulatory bodies violated federal securities laws. ZST is a Delaware corporation with its principal place of business in Henan Province, People's Republic of China ("PRC"), where it develops digital and optical networking equipment used by local cable operators. ZST reports its annual financial results to both the Securities and Exchange Commission ("SEC") and to a PRC governmental agency, the State Administration of Industry and Commerce ("SAIC"). According to the complaint, ZST reported financial results to the SEC indicating revenues of over $50,000,000 in 2008 and over $100,000,000 in 2009, while reporting results to the SAIC that were a minuscule fraction of those figures. Plain-

tiff contends that the financial data submitted to one of these regulatory bodies was false, and that the submissions violated both the Securities Act of 1933 and the Securities Exchange Act of 1934.

The Court has previously addressed motions to dismiss filed by Defendants ZST, Kempisty & Company, P.C. ("Kempisty"), and WestPark Capital, Inc. ("WestPark") and Rodman & Renshaw, LLC ("Rodman & Renshaw"). (Docket No. 93, February 14, 2012 Order, 2012 WL 538279.) The Court dismissed the Securities Act claims with leave to amend, finding that Plaintiff had failed to adequately allege standing. (*Id.* at 17–19.) The Court also dismissed the Exchange Act claims as against Kempisty, with leave to amend, finding that Plaintiff had failed to adequately allege auditor liability. (*Id.* at 13–14.)

Plaintiff filed an amended class action complaint on March 9, 2012. (Docket No. 94.) Defendants now move to dismiss various claims contained in the amended complaint. (Docket Nos. 120, 124, 125, 136.) For the reasons set forth below, the Court finds that Plaintiff has not, and cannot properly allege standing under the Securities Act. Moreover, the Court concludes that the Exchange Act claims are adequately pleaded as against Defendants WestPark and Rappaport, but fail as a matter of law against Defendants Anthony Pintsopoulos, Kevin Deprimio, Jason Stern, the Amanda Rappaport Trust, and the Kailey Rappaport Trust. Accordingly, the motions are **GRANTED in part** and **DENIED in part.**

## II.

## BACKGROUND

The action is brought on behalf of all persons who either [1] purchased or otherwise acquired ZST securities pursuant or traceable to the Company's Registration Statement issued in connection with its October 20, 2009 initial public offering of securities ("IPO"); or [2] purchased or otherwise acquired ZST securities from October 20, 2009 through April 21, 2011 (the "Class Period"), except for certain excluded persons and entities. (AC ¶ 42.) The amended complaint alleges that Defendants violated Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") by submitting to the SEC financial reports that were materially false and misleading, and which omitted facts to conceal adverse material information about the business operations and future prospects of ZST. (*Id.* ¶¶ 1–9, 183.)

In deciding a motion to dismiss, the Court must accept all well-pleaded factual allegations in the complaint as true. *Blake v. Dierdorff,* 856 F.2d 1365, 1368 (9th Cir. 1988).

The complaint alleges that ZST maintained two materially different sets of financial records during the Class Period, one for reporting financial results in China to the SAIC, and another for reporting financial results in the United States to the SEC. (*Id.* ¶ 1.) Because financial reports submitted to the SAIC, unlike those filed with the SEC, are not publicly available, the discrepancies between the two sets of records was not known to the investing public until April 21, 2011, when that fact was disclosed via a two-part Internet report entitled "ZST Digital Networks Unfolded: A Mutual Fund Manager Seeks the Truth." (*Id.* ¶¶ 2, 84.) The report disclosed that ZST had reported revenue of over $55 million to the SEC in 2008, and revenue of only $20,000 to the SAIC for the same fiscal year, and that the Company had reported losses of $130,000 to the SAIC, rather than the $6 million profit reported to the SEC. (*Id.* ¶ 85.) Following

publication of the report, ZST's per share stock price immediately dropped from $4.36, the closing price on the day prior, to $2.68, the closing price on April 21. (*Id.* ¶ 86.)

The disclosure of this information revealed that ZST's Registration Statement, filed with the SEC in connection with the IPO, contained materially different financial reporting than statements filed by the Company's wholly-owned subsidiary, Zhengzhou ZST, to China's SAIC. (*Id.* ¶¶ 87–94.) According to the amended complaint, ZST's annual SAIC reports were audited by Chinese certified accountants, and contained "lengthy audit opinions verifying the veracity of the reports." (*Id.* ¶ 64.) Furthermore, although one unaffiliated with the company must submit requests to the SAIC and pay certain fees to obtain such reports, the amended complaint alleges that they are "readily available" to a company's authorized agents, such as its auditors or underwriters. (*Id.* ¶¶ 66–67.)

The amended complaint asserts that: [1] if ZST's SEC reports were materially inaccurate, various Defendants are liable under both the Securities Act and the Exchange Act for the material misstatements contained therein; [2] if ZST's SAIC reports were inaccurate, various Defendants are liable under the Securities Act for representing in the Registration Statement that ZST's Chinese subsidiary had been and would continue to faithfully comply with all Chinese laws, and/or failing to disclose in the Registration Statement that the Company was submitting contradictory financial reports to the SAIC. (*Id.* ¶ 9.)

Plaintiff asserts four causes of action, under Sections 11 and 15 of the Securities Act, and Sections 10(b) and 20(a) of the Exchange Act, and names a number of Defendants, including ZST (the "Issuer Defendant"); several of the Company's ex-

ecutives and officers (the "Individual Issuer Defendants"), who allegedly signed various SEC filings containing the misstatements and/or omissions; Rodman & Renshaw and WestPark, two investment banks which served as underwriters for the Company's IPO (the "Underwriter Defendants"); several of WestPark's executives and officers; and the Company's outside accountant, Kempisty & Company, P.C., which audited the financial statements submitted to the SEC ("Kempisty" or the "Auditor Defendant"). (*Id.* ¶¶ 14–41.)

## III.

## DISCUSSION

### A. PLEADING STANDARDS UNDER FEDERAL RULES OF CIVIL PROCEDURE 12(B)(6) AND 9(B), AND THE *PSLRA*

A complaint may be dismissed if it fails to state a claim upon which relief can be granted. *See* Fed.R.Civ.P. 12(b)(6). On a motion to dismiss under Rule 12(b)(6), a court must accept as true all factual allegations pleaded in the complaint, and construe them "in the light most favorable to the nonmoving party." *Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 337–38 (9th Cir.1996) Dismissal under Rule 12(b)(6) may be based on either (1) a lack of a cognizable legal theory, or (2) insufficient facts under a cognizable legal theory. *SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.,* 88 F.3d 780, 783 (9th Cir.1996) (citing *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 534 (9th Cir. 1984)).

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R.Civ.P. 8(a)(2). The Supreme Court has interpreted this rule to allow a complaint to survive a motion to dismiss only if it

"contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has not sufficiently established that the pleader is entitled to relief. *Id.* at 1950.

While a complaint generally need not contain detailed factual allegations, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (citation, alteration, and internal quotation marks omitted). Similarly, a court need not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.2001). In other words, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.... While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 129 S.Ct. at 1949–50.

Moreover, Federal Rule of Civil Procedure 9(b) imposes heightened pleading requirements for claims of fraud. *See* Fed. R.Civ.P. 9(b). Under Rule 9(b), a plaintiff "must state with particularity the circumstances constituting fraud," but can allege generally "[m]alice, intent, knowledge, and other conditions of a person's mind." *Id.* The particularity requirement "has been interpreted to mean the pleader must state the time, place and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Miscellaneous Serv. Workers, Drivers & Helpers, Teamsters Local No. 427 v. Philco–Ford Corp.*, 661 F.2d 776, 782 (9th Cir.1981). Further, where there are multiple defendants, "Rule 9(b) does not allow a complaint to ... lump multiple defendants together but require[s] plaintiffs to differentiate their allegations when suing more than one defendant." *Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir.2011) (citation and internal quotation marks omitted). In addition, the plaintiff must "set forth what is false or misleading about a statement, and why it is false." *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir.2009) (internal quotations omitted). These requirements "ensure ... that allegations of fraud are specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir.1985).

Beyond the requirements of Fed. R.Civ.P. 12(b)(6) and 9(b), the PSLRA establishes higher pleading standards for allegations of securities fraud. These requirements pertain largely to the "scienter" and "falsity" inquiries, which the Court addresses below.

## B. SECURITIES ACT CLAIMS

Plaintiff's first cause of action is asserted under Section 11 of the Securities Act, against all Defendants except for Defendants Chen and Na. (AC ¶¶ 96–109.) Plaintiff alleges that all such Defendants are liable for misstatements

and/or omissions contained in the Company's Registration Statement—which purportedly includes both the Initial Registration Statement, declared effective on October 20, 2010, as well as the Amended Registration Statement, declared effective on January 19, 2011—because [1] the Individual Defendants, except for Defendants Chen and Na, signed the Statement and, as directors and officers of ZST, and controlling persons of the issuer, owed to the holders of ZST securities obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained within it; and [2] the Underwriter Defendants and Kempisty owed the same duty, and as agents of ZST had ready access to the Company's filings with the SAIC, and failed to ensure that its SAIC filings were included or referenced in the Registration Statement. (*Id.* ¶¶ 99–102.) Plaintiff's second cause of action, under Section 15 of the Securities Act, is a "control" claim largely derivative of and dependent on primary violations of the Act.

Defendants again contend that Plaintiff has failed to adequately plead that his shares were issued pursuant to or are traceable to the applicable Registration Statement, as required by 15 U.S.C. § 77k(a).

### 1. LEGAL STANDARDS

■ Section 11 of the Securities Act of 1933 provides a cause of action against issuers, underwriters, auditors and all persons signing a registration statement that "contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). That section "was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston,* 459 U.S. 375, 381, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). Accordingly, to establish a *prima* facie case under Section 11, a plaintiff "need only show a material misstatement or omission." *Id.; see also In re Daou Systems, Inc.,* 411 F.3d 1006, 1027 (9th Cir.2005) ("The plaintiff in a [Section 11] claim must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment.") (citations omitted). The plaintiff need not demonstrate scienter, reliance, or loss causation. *Id.* "Although [S]ection 11 does not contain an element of fraud, a plaintiff may nonetheless be subject to Rule 9(b)'s particularity mandate if his complaint 'sounds in fraud.'" *Daou,* 411 F.3d at 1027.

■ "To have standing to bring suit under Section 11, a plaintiff must have purchased stock in the offering at issue, or trace later-purchased stock back to that offering." *Plichta v. SunPower Corp.,* 790 F.Supp.2d 1012, 1022 (N.D.Cal.2011) (citing *Hertzberg v. Dignity Partners, Inc.,* 191 F.3d 1076, 1080 n. 4 (9th Cir.1999)). District courts in this Circuit addressing the issue have uniformly held that mere boilerplate allegations of traceability are insufficient to plead this standing requirement. *See, e.g., Plichta,* 790 F.Supp.2d at 1022–1023 ("Plaintiffs have not explained, however, how even with discovery, they hope to be able to prove that any of their shares are traceable to the original offering, given that the shares are fungible and that millions of shares were already being traded on the open market at the time of the offering."); *In re Century Aluminum*

*Co. Securities Litigation,* 749 F.Supp.2d 964, 978 (N.D.Cal.2010) ("Plaintiffs have neither alleged in the FAC, nor have they articulated in their oppositions, how to trace any particular shares in the 75 million share pool that existed after the secondary offering to show that those shares came from the secondary offering.") In *In re STEC Inc. Securities Litigation,* a district court in this District noted the language used in cases such as *Plichta* and *Century Aluminum,* and held that, under the relevant case law, a plaintiff need not "plead facts that prove their securities are traceable to the secondary offering, but [must] plead facts showing that their shares *can be traced.*" 2011 WL 2669217, at *14 (C.D.Cal.2011).[1] That interpretation accords with the Ninth Circuit's own discussion of the issue in *Hertzberg,* where the Court of Appeals explained that:

> The limitation on "any person" is that he or she must have purchased "such security." Clearly, this limitation only means that the person must have purchased a security issued under that, rather than some other, registration statement. While it might present a problem of proof in a case in which stock was issued under more than one registration statement, the only Dignity stock ever sold to the public was pursuant to the allegedly misleading registration statement at issue in this case.

191 F.3d 1076, 1080 (internal citation omitted). At least one court in this District has been more liberal in construing Section 11's standing requirement. *See In re SeeBeyond Technologies Corp. Securities Litigation,* 266 F.Supp.2d 1150, 1171–1172 (C.D.Cal.2003) (finding allegation that a plaintiff "purchased [the defendant's] common stock issued pursuant to the registration statement/prospectus filed by the Company with the SEC" sufficient to establish Section 11 standing at the pleading stage).

### 2. THE COURT'S FEBRUARY 14, 2012 ORDER

In its February 14, 2012 Order, the Court dismissed the Securities Act claims, holding that Plaintiff had failed to adequately allege traceability. In so finding, the Court examined the relevant case law at some length, and concluded that, even under the more lenient standard articulated in these cases, the complaint's allegations were insufficient:

> Defendants note the existence of a second registration of ZST's securities on January 14, 2010, before Lead Plaintiff Gray purchased his shares. According to the certification offered by Gray, his shares were purchased on March 3, 2011 and March 11, 2011, fifteen months after the original IPO and thirteen months after the second registration. (Docket No. 11, Declaration of Michael Goldberg ("Goldberg Decl."), Ex. C [Shareholder Certification].) In opposition, Plaintiff avers that, as of August 2011—after the Class Period—none of the shares issued in the second registration "had sold into any public market." (Opp. at 19.) Plaintiff cites a 10–K filed by the company on August 2, 2011, which states that "in January 2010, we registered 1,086,400 shares of common stock held by affiliates of WestPark, all of which may be freely sold and transferred." (Hibbard Decl., Ex. J [Amended 2010 10–K.].) Plaintiff focuses on that filing's use of the word "may," arguing that "the mere fact of registration of these addi-

---

1. The court nevertheless "agree[d] with the *Century Aluminum* analysis and the conclusion that post-*Twombly* and *Iqbal,* Plaintiffs do not adequately allege standing simply by stating they purchased shares 'traceable to' the Registration Statement and Prospectus." 2011 WL 2669217, at *14.

tional shares does not raise the possibility that Lead Plaintiff's *publicly purchased* shares could be traceable to any Registration Statement other than the one at issue in this action." (Opp. at 20.) However, Defendants note in reply that shares registered in the second Registration Statement had indeed been sold in the public market by the time Gray bought his shares in March 2011. (Docket No. 85, UW–Rep. at 6–7.) Moreover, an argument similar to Plaintiff's, as Defendants note, was recently rejected by a court in this District. *Katz* [*v. China Century Dragon Media, Inc.*], 2011 WL 6047093, at *5 [ (C.D.Cal. Nov. 30, 2011) ] ("Although Plaintiffs suggest that Katz and Shapiro must have bought in the IPO, because a planned resale of shares released under a private placement agreement did not occur, Plaintiffs' allegations do not rule out the possibility that Katz and Shapiro purchased their shares in a manner not traceable to the IPO. Thus, Plaintiffs must plead with more specificity that Katz and Shapiro purchased their shares in a manner traceable to the IPO.")

The Court finds that, as currently pleaded, the complaint cannot satisfy Section 11's standing requirements. Plaintiff has alleged only that he "purchased ZST securities at artificially inflated prices during the Class Period and has been damaged thereby," and brings suit "on behalf of persons who acquired shares of ZST Securities pursuant or traceable to the Registration Statement in connection with the IPO." (Compl. ¶¶ 11, 29, 61.) Even under the more liberal pleading standard articulated in *SeeBeyond,* those allegations are insufficient. 266 F.Supp.2d at 1171–1172; *see also Katz,* 2011 WL 6047093, at *5 (distinguishing between particular allegation that plaintiff purchased shares *during* the IPO, and generalized allegations that "[e]ach

Class Member acquired his, her, or its shares in, pursuant to and/or traceable to, and in reliance on, the Registration Statement and Prospectus," and finding the latter insufficient). Plaintiff need not plead facts *proving* that his shares are traceable to the Registration Statement in question, "but [must] plead facts showing that [his] shares *can be traced.*" *STEC Inc.,* 2011 WL 2669217, at *14. (February 14, 2012 Order at 18–19.)

### 3. AMENDED COMPLAINT

The amended complaint supplements these allegations and proposes alternative theories of traceability. Plaintiff alleges that on October 16, 2009, ZST filed its Initial Registration Statement with the SEC, on Form S–1/A. (AC ¶ 50.) That Initial Registration Statement, as previously noted, contained the Company's financial results for fiscal year 2008, as well as for the first six months of fiscal year 2009. (*Id.*) The Initial Registration Statement was declared effective on October 20, 2009, and ZST filed its Initial Prospectus with the SEC on October 20, 2009. (*Id.* ¶ 51.) The amended complaint alleges that the Individual Issuer Defendants each signed the Initial Registration Statement; that Defendants WestPark and Rodman & Renshaw served as underwriters for the IPO; and that Defendant Kempisty audited ZST's financial statements contained in the Initial Registration Statement. (*Id.* ¶ 52.) The IPO was for 3,125,000 shares of ZST stock at a price of $8.00 per share, producing gross proceeds of approximately $25,000,000. (*Id.* ¶ 53.)

Previously, on January 9, 2009, the Company closed a share exchange whereby the Company had issued 806,408 shares of its common stock to certain individuals in exchange for all of the issued and outstanding securities of World Orient Universal Limited. (*Id.* ¶ 54.) The Company

then registered the January 2009 shares for sale in a two-part process. (*Id.* ¶ 55.) The Company first registered the bulk of the January 2009 shares as part of the Initial Registration Statement, leaving out only the shares affiliated with Defendant WestPark and held by the Individual Underwriter Defendants. (*Id.*) Then, on January 14, 2010, two months after the IPO, the Company completed its registration of the remaining January 2009 shares by resubmitting a registration statement with the SEC on December 31, 2009, which was materially identical to the Initial Registration Statement except for the fact that it pertained only to the remaining January 2009 shares. (*Id.* ¶ 56.) The amended complaint alleges that, despite the absence of any legitimate impediment to registering all of the January 2009 shares in the Initial Registration Statement, ZST purposefully avoided registering shares affiliated with WestPark for "the sole purpose of shielding Defendants from legal liability. . . ." (*Id.* ¶ 57.) Instead, ZST chose to register those shares immediately after the Initial Registration Statement by filing the Amended Registration Statement on Form S–1/A, declared effective on January 26, 2011. (*Id.*) The amended complaint alleges that, "[i]n filing two, materially-identical registration statements within two months of each other, ZST schemed to avoid liability for Defendants' unlawful conduct under the federal securities laws." (*Id.* ¶ 58.)

The complaint thus alleges that, "[i]rrespective of whether the Registration Statement is one or two documents, Lead Plaintiff, and members of the class, have standing to bring Securities Act claims against all of the ZST Defendants, except for Defendants Chen and Na, because all of those Defendants signed both the Initial Registration Statement and the Amended Registration Statement," and therefore "all shares available in the public market are traceable to registration statements issued by [them]." (*Id.* ¶ 59.) Finally, the complaint alleges that all outstanding shares for which CEO and sole equity owner of Defendant WestPark, Defendant Richard Rappaport, served as underwriter, may also be traced. (*Id.* ¶ 60.) Because Rappaport acted as a listed underwriter through his wholly owned and controlled alter-ego WestPark, and as a statutory underwriter under the Amended Registration Statement, "all ZSTN shares purchased on the public markets . . . are traceable to registration statements for which . . . Rappaport has legal responsibility as an underwriter." (*Id.*)

In opposition to ZST's motion, Plaintiff offers a more detailed explanation of his standing argument, contending that "Defendants schemed all along to register all outstanding shares of ZST common stock for public sale in a single public offering under a single registration statement, and . . . they split this registration statement into two sets of documents for the purpose of making the exact arguments they make now." (Docket No. 140, Opp. 1 at 6.) Plaintiff describes the purported scheme as follows:

Defendants first conceived of their scheme in 2007, when ZST enlisted WestPark to employ its WRASP Process to sell ZST common stock in the United States. The first step in this WRASP Process was for WestPark to engineer a reverse-merger between ZST and an American shell company. (AC ¶¶ 36, 83.) As a result of this reverse merger, Defendant Rappaport, CEO of WestPark, was named as a Chief Executive Officer and a Director of ZST in 2007 and 2008. (*Id.* ¶ 83.) ZST compensated WestPark for this part of the process with ZST securities, which were later converted into 806,408 shares of ZST common stock on January 9, 2009

(the "Reverse Merger Shares"). (*Id.* ¶ 54.) Defendant Rappaport redistributed those shares from WestPark to his employees, Defendants Pintsopoulos, DePrimio, and Stern, as well as to his children, through the Amanda Rappaport Trust and Kailey Rappaport Trust. (*Id.* ¶¶ 29–33.)

Importantly, ZST and WestPark, through Rappaport, had conceived of their fraud as a single scheme, from reverse merger, all the way through selling shares to the public securities markets. Pursuant to the terms of the reverse merger, the Company agreed to later register the 1,194,380 shares of outstanding Common stock and the 170,629 shares of Common stock underlying the warrants held by the Company's stockholders for public sale. (*Id.* ¶ 54 n. 8.)

Against securities industry common practice, the Company registered the Reverse Merger Shares as part of a two-step process. The Company first registered the bulk of the Reverse Merger Shares as part of the Initial Registration Statement. Only the shares affiliated with WestPark, worth only 6% of the total, (*Id.* ¶ 83 n. 25), were not offered for sale. The Initial Registration Statement specifically referred to the subsequent registration of the WestPark Shares. As a result, only two months after the first step of the IPO, on December 31, 2009, Defendants began submitting the materially identical second set of ZST documents for registration of the WestPark shares for public sale, culminating in the Amended Registration Statement, which finally registered the previously issued WestPark shares.

(*Id.* at 7–8.)

### 4. Section 11 Standing

Plaintiff contends that, while the case law has not deviated from a strict reading of the traceability requirement, "none of those cases involved allegations that the defendants had bifurcated an IPO into sequential, duplicate registration statements to render traceability impossible." (*Id.* at 9.) Plaintiff then invites this Court to adopt rules employed "[i]n the parallel context of private placements" of securities, and to be the first tribunal to abandon Section 11's strict traceability requirement in favor of that more functional analysis. (*Id.*)

The Court refuses to do so, and again holds that the complaint has failed to adequately allege Section 11 standing. Although at times he alleges that "ZST had a single public initial offering, under a single integrated registration statement," Plaintiff essentially concedes in his amended complaint and in his opposition that the registration statements were distinct. (*Id.* at 7 ("The Securities Act simply does not contemplate the filing of sequential duplicate registration statements for the sole purpose of avoiding liability under the Act."); AC ¶ 58 ("In filing two, materially-identical registration statements within two months of each other, ZST schemed to avoid liability for Defendants' unlawful conduct under the federal securities laws.").) Rather, Plaintiff alleges that "both documents were conceived of and drafted contemporaneously, as the scheme was planned and executed." (Opp. 1 at 7 n. 10; AC ¶¶ 36, 54–60.) Although the Circuit may at some time conclude that new practices in the securities markets warrant a departure from the current strict "traceability" rule, this Court will not be the first to chart that path. The parties offer conflicting characterizations of "secondary offerings," as well as the frequency with which these practices are employed, and the Court will not re-formulate long-standing federal securities law based on what essentially amounts to com-

peting policy arguments. Both parties effectively concede that Plaintiff cannot, under existing precedent, trace his shares to the offering in question; as the Court held in its February 14, 2012 Order, the existence of the second registration, which the SEC reviewed and authorized separately, and identified as distinct, precludes tracing in this instance.

Accordingly, the Court finds that despite his strenuous efforts, Plaintiff still fails to meet Section 11's standing requirements. For that reason, the first and second causes of action, for violations of Sections 11 and 15 of the Securities Act, are **DISMISSED without leave to amend.**

## C. EXCHANGE ACT CLAIMS

The Court previously sustained the Exchange Act claims as against ZST, and dismissed these claims as against Kempisty. (February 14, 2012 Order at 10–12, 13–14.) The third cause of action in the amended complaint alleges that Defendants ZST, Kempisty, and Rappaport, as CEO and sole equity owner, and alter-ego of WestPark, violated Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder. (AC ¶¶ 177–189, 34; Opp. 1 at 18 n. 18.) Plaintiff's fourth causes of action, for violations of Section 20(a) of the Exchange Act is, like his second cause of action, a "control" claim largely derivative of and dependent on primary violations of the Exchange Act.

Plaintiff alleges that during the Class Period, Defendants carried out a "plan, scheme, and course of conduct which was intended to and, through the Class Period, did: [1] deceive the investing public, including Lead Plaintiff and other Class members . . .; and [2] caused Lead Plaintiff and other members of the Class to purchase ZST securities at artificially inflated prices." (*Id.* ¶ 179.) Plaintiff alleges that "Rappaport conspired and actively participated with the ZST Defendants to [a] engineer a reverse merger whereby ZST could gain access to United States markets; [b] engineer a two-step public offering to insulate himself from liability emanating from the false and misleading statements in public offering documents; and [c] misleading the public through the issuance of false and misleading statements in those offering documents. (*Id.* ¶ 181.) Finally, Plaintiff alleges that Kempisty, in furtherance of that fraudulent scheme, audited and approved ZST's financial statements despite knowing or deliberately disregarding the fact that they were materially false and misleading. (*Id.* ¶ 180.)

The amended complaint alleges that the Defendants made untrue statements of material fact or omitted to state material facts necessary to make the statements not misleading, despite having possession of material adverse non-public information which contradicted those statements and public information "about the business, operations, and future prospects of ZST. . . ." (*Id.* ¶¶ 182–183.) Unlike the claims brought under the Securities Act, Plaintiff relies solely on his first theory of liability in pleading these claims, namely that ZST's financial reports submitted to the SEC were materially inaccurate, and that Defendants are therefore liable for materially misstating the financial information contained therein. (*Id.* ¶ 6.) Plaintiff and other members of the Class, according to the complaint, were ignorant of the fact that market prices of ZST's publicly traded securities were artificially inflated, and relied directly and/or indirectly on the false and misleading statements made by Defendants, "or upon the integrity of the market in which ZST's stock trades." (*Id.* ¶ 186.) As a direct and proximate result of that conduct, Plaintiff alleges that he and other members of the Class suffered dam-

ages in connection with their purchase of the Company's securities. (*Id.* ¶ 188.)

To state a claim under Section 10(b) of the Exchange Act, a plaintiff must allege and adequately plead (1) a material misstatement or omission; (2) scienter; (3) connection with the purchase or sale of a security; (4) reliance; (5) proximate or "loss" causation; and (6) economic loss. *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 341, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).

Defendant WestPark and various individual WestPark Defendants each move to dismiss the Exchange Act claims as against themselves; Defendant Kempisty joins in each of these motions. (Docket Nos. 125, 140, 131.) After summarizing its previous ruling on these claims, the Court addresses these motions in turn.

### 1. THE COURT'S FEBRUARY 14, 2012 ORDER

Except with respect to Defendant Kempisty, the Court sustained the Exchange Act claims as against Defendants' first round of motions to dismiss, finding that "the marked disparity between the revenue figures reported to American and Chinese regulatory bodies, along with the Company's subsequent and ambiguous explanation of those discrepancies, [and] the strong inference that the Chinese statement reflected an overstatement in revenues reported to the SEC, are sufficient to constitute falsity and scienter under the PSLRA." (February 14, 2012 Order at 10.) In sum, the Court reasoned that it could not:

> conclude that Defendants' reading of the facts is any more compelling than that which is drawn by Plaintiff's allegations. The Company's reported revenue to the SEC and to the SAIC differ by a factor of over two thousand, and the Company's reported profit of $6 million to

American regulatory authorities is entirely inconsistent with its report of a loss in China. Although ZST sought to explain these discrepancies in its amended 2010 10–K, the proffered explanation merely dances around the issue, noting the existence of a discrepancy without explaining how the company came to report such dramatically different results to the two different governmental agencies.

(*Id.* at 10–11.)

Moreover, the Court found that the complaint had adequately pleaded both loss causation and reliance. (*Id.* at 14–15.)

### 2. WESTPARK

WestPark contends that the Exchange Act claims should be dismissed because [1] WestPark did not make any of the misleading statements contained in ZST's SEC filings; and because Plaintiff has not adequately alleged either [2] that West-Park acted with scienter; or [3] that he relied on any of the alleged misstatements. (WP–Mem. at 7–15.) WestPark also contends that Plaintiff's "scheme liability" claim under Rule 10b–5(a) and (c) should be dismissed. (*Id.* at 15–16.)

#### a. Making of Misstatements

Plaintiff contends in opposition that "WestPark was not a hapless participant in the fraud that lacked authority over any offering documents," but rather "was the *architect* of the fraud," as the investment bank "worked with ZST from 2007 [through] 2010 to help engineer every aspect of the fraud upon American investors, from the reverse merger to bringing the Company public." (Opp. 1 at 18.) Plaintiff also notes that WestPark's name is featured prominently on the offering documents, and that WestPark distributed the offering documents to the investing public. (*Id.* at 17.) Accordingly, Plaintiff argues

that "WestPark is clearly responsible for the fraudulently issued statements, as it ... authored them." (*Id.* at 1 at 18.)

Relying primarily on the Supreme Court's recent decision in *Janus Capital Grp., Inc. v. First Derivative Traders,* WestPark contends that because it was not "the entity with authority over the content of the statement and whether and how to communicate it," it cannot be liable under Section 10(b). —— U.S. ——, 131 S.Ct. 2296, 2303, 180 L.Ed.2d 166 (2011). In *Janus,* the Court explained that:

> For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker. And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by— the party to whom it is attributed. This rule might best be exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said.

*Id.* at 2302.

Accordingly, the Court adopted something of a functional approach to the "making" inquiry, focusing on which entities "control" the making of the statement and its content, and looking, in part, to various indicia of "attribution" to make that determination. Interpreting *Janus,* district courts have sustained Section 10(b) claims brought against underwriters on similar facts. In *In re Allstate Life Ins. Co. Litigation,* a district court in Arizona upheld a Section 10(b) claim made against an underwriter, finding allegations that "the names of [the underwriters] ... were placed 'prominently and in bold type on the first page of the Official Statements'" sufficient to state a claim under *Janus.* 2012 WL 176497, at *5 (D.Ariz. Jan.23, 2012) (citing *Janus,* 131 S.Ct. at 2302). Similarly, in *In re National Century Financial Enterprises, Inc.,* a district court in the Southern District of Ohio held that private placement memorandums could be a "shared product":

> Credit Suisse attempts to cast the issue of attribution as an either-or situation: the PPMs either belonged to the issuers or Credit Suisse, but not to both. However, a factfinder could reasonably find from the available evidence that the PPMs should be attributed to the issuers and to Credit Suisse. The Noteholders have produced testimony and evidence that the PPMs were a shared product. Credit Suisse's own witnesses testified of playing a role in drafting and preparing the PPMs and of exercising control over their content. The PPMs displayed the Credit Suisse name prominently on the front pages and told potential investors that Credit Suisse was "specifically designated" to make representations about the notes. This is sufficient to create a triable issue as to whether Credit Suisse can be held liable for the misrepresentations in the PPMs.

846 F.Supp.2d 828, 861 (S.D.Ohio 2012) (citing *Janus,* 131 S.Ct. at 2302).

The Court finds that Plaintiff's allegations are sufficient in this respect. Plaintiff alleges in some detail that WestPark was instrumental not only in preparing or assisting with the relevant statements, but that WestPark can, in fact, be said to have "issued" them. Moreover, Plaintiff notes

that WestPark's name was featured prominently on the offering documents, as in *Allstate* and *National Century*. At the pleading stage, that is sufficient to allege that WestPark "made" the relevant statements. However, as the *Allstate* court noted, "Plaintiffs will ultimately need to prove ... that [WestPark], in fact, made such statements by showing that these were statements over which [WestPark] exercised ultimate authority." 2012 WL 176497, at *5.

### b. Scienter and Reliance

WestPark next contends that Plaintiff has failed to allege that it acted with scienter in making these statements, or that he relied on any such statements. (WP-Mem. at 9–13.)

### i. Legal Standards

■ To demonstrate scienter, the PSLRA requires that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" in making misleading statements and/or omissions. 15 U.S.C. § 78u–4(b)(2). "Under this provision, the mental state required for securities fraud liability is distinct from the level of pleading required to infer that mental state." *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir.2008) (quoting *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 975 (9th Cir.1999)). A plaintiff must show that the defendant "engaged in 'knowing' or 'intentional' conduct." *South Ferry*, 542 F.3d at 782. In the Ninth Circuit, "reckless conduct can almost meet this standard to the extent that it reflects some degree of intentional or conscious misconduct, or what [courts] have called 'deliberate recklessness.'" *Id.* (citing *Silicon Graphics*, 183 F.3d at 977) (quotation marks omitted). Thus, in sum, a complaint must state with particularity facts giving rise to a strong inference of "deliberate recklessness" in order to satisfy the PSLRA's pleading requirements for scienter.

■ The Supreme Court has held that this "strong inference" must be "cogent and compelling, [and] thus strong in light of other explanations." *Tellabs, Inc. v. Makor Issues and Rights, Ltd.*, 551 U.S. 308, 324, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). The reviewing court must ask, "when the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter a least as strong as any opposing inference?" *Id.* at 326, 127 S.Ct. 2499. In other words, "[a] court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir.2009). "The court must determine whether '*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Id.* (quoting *Tellabs*, 551 U.S. at 323, 127 S.Ct. 2499); *see also South Ferry*, 542 F.3d at 784 ("The Supreme Court's reasoning in *Tellabs* permits a series of less precise allegations to be read together to meet the PSLRA requirement.")

Moreover, with respect to falsity, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1).

The scienter and falsity inquiries overlap significantly. In *Ronconi v. Larkin*, the Ninth Circuit explained that:

Because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, we have incorporated the dual pleading requirements of 15 U.S.C. §§ 78u–4(b)(1) and (b)(2) into a single inquiry. In considering whether a private securities fraud complaint can survive dismissal under Rule 12(b)(6), we must determine whether "particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or with 'deliberate recklessness' made false or misleading statements to investors."

253 F.3d 423, 429 (9th Cir.2001) (quoting *Silicon Graphics,* 183 F.3d at 979). The Ninth Circuit recently re-iterated that "falsity may itself be indicative of scienter where it is combined with allegations regarding a management's role in the company that are particular and suggest that the defendant had actual access to the disputed information, and where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Zucco Partners,* 552 F.3d 981 at 1000 (quotation marks and citation omitted) (quoting *South Ferry,* 542 F.3d at 785).

### ii. Scienter Allegations as to WestPark and Rappaport

■ The Court has already addressed Plaintiff's scienter and reliance allegations with respect to ZST, finding them sufficient to meet the standards articulated by the PSLRA and the case law interpreting those provisions. (February 14, 2012 Order at 10–12.) In light of Plaintiff's extensive allegations concerning the intimate connection between WestPark and ZST, including that Rappaport was instrumental in bringing the Company public in the United States, the Court finds the allegations of scienter sufficient for pleading

purposes. Plaintiff alleges that Defendants first conceived of their "scheme" in 2007, when ZST enlisted WestPark to employ its WRASP process to sell ZST common stock in the United States. The first step in this WRASP process, according to the amended complaint, was for WestPark to engineer a reverse-merger between ZST and an American shell company. (AC ¶¶ 36, 83.) As a result of this reverse merger, Plaintiff alleges that Defendant Rappaport, CEO of WestPark, was even named as a Chief Executive Officer and a Director of ZST in 2007 and 2008. (*Id.* ¶ 83.) ZST compensated WestPark for this part of the process with ZST securities, which were later converted into 806,-408 shares of ZST common stock on January 9, 2009 (the "Reverse Merger Shares"). (*Id.* ¶ 54.) Defendant Rappaport then redistributed those shares from WestPark to his employees, Defendants Pintsopoulos, DePrimio, and Stern, as well as to his children, through the Amanda Rappaport Trust and Kailey Rappaport Trust. (*Id.* ¶¶ 29–33.)

As the Court explained in its February 14, 2012 Order, allegations tying certain defendants to the alleged fraudulent conduct may be read in the context of the complaint taken as a whole. *See Tellabs,* 551 U.S. at 324, 127 S.Ct. 2499 (holding that the "strong inference" of scienter required by the PSLRA must be "cogent and compelling, [and] thus strong in light of other explanations."); *Zucco Partners,* 552 F.3d at 991 ("The court must determine whether 'all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard' .... A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious

inference is at least as compelling as any opposing innocent inference."); *South Ferry,* 542 F.3d at 784 ("The Supreme Court's reasoning in *Tellabs* permits a series of less precise allegations to be read together to meet the PSLRA requirement.") As the Ninth Circuit made clear in *South Ferry:*

> [A]llegations regarding management's role in a company may be relevant and help to satisfy the PSLRA scienter requirement in three circumstances. First, the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is "cogent and compelling, thus strong in light of other explanations." This view takes such allegations into account when evaluating all circumstances together.

*South Ferry,* 542 F.3d 776, 785–786 (internal citation omitted).

Although Defendants contend that the amended complaint fails to explicitly tie WestPark and Rappaport to the purportedly false statements themselves, the allegations do detail Rappaport's intimate knowledge of, and extensive involvement with bringing ZST public, which, according to the amended complaint, entailed making the fraudulent representations to the SEC. Combined with WestPark's role in underwriting the Company's public offering, the Court finds these allegations sufficient to raise a "strong inference" of scienter.

Moreover, WestPark's reliance argument is premised on its prior contention, already rejected by the Court, that the complaint has failed to allege "that [it] made any misstatement." (WP–Mem. at 14.) Accordingly, this argument fails as well.

### c. Scheme Liability

Finally, WestPark seeks dismissal of Plaintiff's alternative theory of "scheme liability" under Rule 10b–5(a) or (c).

WestPark contends that this theory falls alongside Plaintiff's standard Section 10(b) claim, and that Plaintiff has failed to allege that WestPark "used or employed a manipulative or deceptive device or contrivance. (WP–Mem. at 15.)

"Under Rule 10b–5(a) or (c), a defendant who uses a 'device, scheme, or artifice to defraud,' or who engages in 'any act, practice, or course of business which operates or would operate as a fraud or deceit,' may be liable for securities fraud." *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.,* 655 F.3d 1039, 1057 (9th Cir. 2011) (citing 17 C.F.R. § 240, Rule 10b–5). "Courts have generally held that '[a] Rule 10b–5(a) and/or (c) claim cannot be premised on the alleged misrepresentations or omissions that form the basis of a Rule 10b–5(b) claim.' " *Id.* (citing *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 177 (2d Cir.2005) ("[W]here the sole basis for such claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b–5(a) and (c).")).

Although WestPark contends that "Plaintiff fails to allege any facts that are separate from those already alleged in his Rule 10b–5(b) misrepresentation and omission claim," this is plainly untrue; as noted above, Plaintiff describes in some detail the fraudulent scheme which WestPark is alleged to have facilitated, and which goes far beyond the purported misrepresentations made in SEC submissions. As WestPark makes no other argument in favor of dismissal, the Court will not otherwise examine the strength of these allegations.

### 3. INDIVIDUAL WESTPARK DEFENDANTS

Defendants Richard Rappaport, Anthony Pintsopoulos, Kevin Deprimio, Jason Stern, the Amanda Rappaport Trust, and the Kailey Rappaport Trust file

their own motion to dismiss, contending that the amended complaint fails to adequately allege Section 10(b) claims against them. Except with respect to Defendant Rappaport, the Court agrees.

The amended complaint alleges that "Defendant Richard Rappaport is, and at all relevant times was, the CEO and sole equity owner, with investment and voting control over WestPark Capital, Inc."; and that he "controls Defendant Amanda Rappaport Trust and Kailey Rappaport Trust as trustee." (AC ¶ 27.) As previously noted, the amended complaint also alleges that "[a]lthough WestPark is a registered corporation, WestPark is wholly owned and controlled by, and acts as the alter-ego of, Defendant Rappaport." (*Id.* ¶ 28.) With respect to the remaining WestPark Defendants, the amended complaint alleges that the Amanda Rappaport and Kailey Rappaport Trusts are alter-egos of Richard Rappaport, and they each received ZST securities as direct compensation for work that Rappaport conducted in the reverse merging taking that Company public. (*Id.* ¶¶ 29–30, 34.) According to the amended complaint, "Rappaport ignored the corporate form in his ownership and control over WestPark, as well as over [the Trusts]." (*Id.* ¶ 34.) Defendants Pintsopoulos, DePrimio and Stern are all alleged to be executives, officers, or employees of WestPark, and to have "participated as an underwriter in the Registration of all ZST securities as an agent of Richard Rappaport and an employee of WestPark, receiving a direct allotment of shares unwritten by Defendant Rappaport, through his alter ego, WestPark." (*Id.* ¶¶ 31, 32, 33.)

Except with respect to Defendant Richard Rappaport, who as previously discussed is alleged to have played an instrumental role in bringing ZST public and the ensuing fraudulent activity, these allegations are clearly insufficient to impose liability under either Section 10(b) or "scheme liability" under Rule 10b–5(a) or (c). The amended complaint merely alleges that these Defendants received and temporarily held ZST securities as employees of WestPark, but does not, as with Defendant Rappaport, make any further allegations as to their role in any of the ZST transactions. Absent further allegations as to these Defendants' connection to the SEC submissions, or any allegations relating to scienter, these claims necessarily fail.

Accordingly, the Exchange Act claims are **DISMISSED without leave to amend** as against Defendants Anthony Pintsopoulos, Kevin Deprimio, Jason Stern, the Amanda Rappaport Trust, and the Kailey Rappaport Trust.

## IV.

## CONCLUSION

For the foregoing reasons, the motions are **GRANTED in part** and **DENIED in part**. The first and second causes of action, under the Securities Act, are **DISMISSED without leave to amend** as against all Defendants. The third and fourth causes of action, brought under the Exchange Act, are **DISMISSED without leave to amend** as against Defendants Anthony Pintsopoulos, Kevin Deprimio, Jason Stern, the Amanda Rappaport Trust, and the Kailey Rappaport Trust. In all other respects, the motions are **DENIED.**

**IT IS SO ORDERED.**