Justice Thomas
delivered the opinion of the Court.
This case requires us to determine whether Janus Capital Management LLC (JCM), a mutual fund investment adviser, can be held hable in a private action under Securities and Exchange Commission (SEC) Rule 10b-5 for false statements included in its client mutual funds’ prospectuses. Rule 10b-5 prohibits “mak[ing] any untrue statement of a material fact” in connection with the purchase or sale of *138 securities. 17 CFR §240.10b-5 (2010). We conclude that JCM cannot be held liable because it did not make the statements in the prospectuses.
I
Janus Capital Group, Inc. (JCG), is a publicly traded company that created the Janus family of mutual funds. These mutual funds are organized in a Massachusetts business trust, the Janus Investment Fund. Janus Investment Fund retained JCG’s wholly owned subsidiary, JCM, to be its investment adviser and administrator. JCG and JCM are the petitioners here.
Although JCG created Janus Investment Fund, Janus Investment Fund is a separate legal entity owned entirely by mutual fund investors. Janus Investment Fund has no assets apart from those owned by the investors. JCM provides Janus Investment Fund with investment advisory services, which include “the management and administrative services necessary for the operation of [Janus] Fun[d],” App. 225a, but the two entities maintain legal independence. At all times relevant to this case, all of the officers of Janus Investment Fund were also officers of JCM, but only one member of Janus Investment Fund’s board of trustees was associated with JCM. This is more independence than is required: By statute, up to 60 percent of the board of a mutual fund may be composed of “interested persons.” See 54 Stat. 806, as amended, 15 U. S. C. § 80a-10(a); see also § 80a-2(a)(19) (2006 ed. and Supp. IV) (defining “interested person”).
As the securities laws require, Janus Investment Fund issued prospectuses describing the investment strategy and operations of its mutual funds to investors. See §§ 77b(a)(10), 77e(b)(2), 80a-8(b), 80a-2(a)(31), 80a-29(aHb) (2006 ed.). The prospectuses for several funds represented that the funds were not suitable for market timing and can be read to suggest that JCM would implement policies to *139 curb the practice.[1] For example, the Janus Mercury Fund prospectus dated February 25,2002, stated that the fund was “not intended for market timing or excessive trading” and represented that it “may reject any purchase request ... if it believes that any combination of trading activity is attributable to market timing or is otherwise excessive or potentially disruptive to the Fund.” App. 141a. Although market timing is legal, it harms other investors in the mutual fund.
In September 2003, the attorney general of the State of New York filed a complaint against JCG and JCM alleging that JCG entered into secret arrangements to permit market timing in several funds run by JCM. After the complaint’s allegations became public, investors withdrew significant amounts of money from the Janus Investment Fund mutual funds.[2] Because Janus Investment Fund compensated JCM based on the total value of the funds and JCM’s management *140 fees constituted a significant percentage of JCG’s income, Janus Investment Fund’s loss of value affected JCG’s value as well. JCG’s stock price fell nearly 25 percent, from $17.68 on September 2 to $18.50 on September 26.
Respondent First Derivative Traders (First Derivative) represents a class of plaintiffs who owned JCG stock as of September 8, 2003. Its complaint asserts claims against JCG and JCM for violations of Rule 10b-5 and § 10(b) of the Securities Exchange Act of 1934, 48 Stat. 891, as amended, 15 U. S. C. §78j(b). First Derivative alleges that JCG and JCM “caused mutual fund prospectuses to be issued for Janus mutual funds and made them available to the investing public, which created the misleading impression that [JCG and JCM] would implement measures to curb market timing in the Janus [mutual funds].” App. to Pet. for Cert. 60a. “Had the truth been known, Janus [mutual funds] would have been less attractive to investors, and consequently, [JCG] would have realized lower revenues, so [JCG’s] stock would have traded at lower prices.” Id,, at 72a.
First Derivative contends that JCG and JCM “materially misled the investing public” and that class members relied “upon the integrity of the market price of [JCG] securities and market information relating to [JCG and JCM].” Id., at 109a. The complaint also alleges that JCG should be held liable for the acts of JCM as a “controlling person” under § 78t(a) (2006 ed., Supp. IV) (§ 20(a) of the Act).
The District Court dismissed the complaint for failure to state a claim.[3] In re Mutual Funds Inv. Litigation, 487 F. Supp. 2d 618, 620 (D Md. 2007). The Court of Appeals for the Fourth Circuit reversed, holding that First Deriva *141 tive had sufficiently alleged that “JCG and JCM, by participating in the writing and dissemination of the prospectuses, made the misleading statements contained in the documents.” In re Mutual Funds Inv. Litigation, 566 F. 3d 111, 121 (2009) (emphasis in original). With respect to the element of reliance, the court found that investors would infer that JCM “played a role in preparing or approving the content of the Janus fund prospectuses,” id., at 127, but that investors would not infer the same about JCG, which could be liable only as a “control person” of JCM under § 20(a). Id., at 128,129-130.
II
We granted certiorari to address whether JCM can be held liable in a private action under Rule 10b-5 for false statements included in Janus Investment Fund’s prospectuses. 561 U. S. 1024 (2010). Under Rule 10b-5, it is unlawful for “any person, directly or indirectly, . . . [t]o make any untrue statement of a material fact” in connection with the purchase or sale of securities. 17 CFR § 240.10b-5(b).[4] To be liable, therefore, JCM must have “made” the material misstatements in the prospectuses. We hold that it did not.[5]
A
The SEC promulgated Rule 10b-5 pursuant to authority granted under § 10(b) of the Securities Exchange Act of 1934, *142 15 U. S. C. § 78j(b). Although neither Rule 10b-5 nor § 10(b) expressly creates a private right of action, this Court has held that “a private right of action is implied under § 10(b).” Superintendent of Ins. of N. Y. v. Bankers Life & Casualty Co., 404 U. S. 6, 13, n. 9 (1971). That holding “remains the law,” Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc., 552 U. S. 148, 165 (2008), but “[concerns with the judicial creation of a private cause of action caution against its expansion,” ibid. Thus, in analyzing whether JCM “made” the statements for purposes of Rule 10b-5, we are mindful that we must give “narrow dimensions ... to a right of action Congress did not authorize when it first enacted the statute and did not expand when it revisited the law.” Id., at 167.
1
One “makes” a statement by stating it. When “make” is paired with a noun expressing the action of a verb, the resulting phrase is “approximately equivalent in sense” to that verb. 6 Oxford English Dictionary 66 (def. 59) (1933) (hereinafter OED); accord, Webster’s New International Dictionary 1485 (def. 43) (2d ed. 1934) (“Make followed by a noun with the indefinite article is often nearly equivalent to the verb intransitive corresponding to that noun”). For instance, “to make a proclamation” is the approximate equivalent of “to proclaim,” and “to make a promise” approximates “to promise.” See 6 OED 66 (def. 59). The phrase at issue in Rule 10b-5, “[t]o make any . . . statement,” is thus the approximate equivalent of “to state.”
For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not “make” a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker. And in the ordinary case, attribution within a statement or implicit from surrounding circum *143 stances is strong evidence that a statement was made by— and only by — the party to whom it is attributed. This rule might best be exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit — or blame — for what is ultimately said.
This rule follows from Central Bank of Denver, N. A. v. First Interstate Bank of Denver, N. A., 511 U. S. 164 (1994), in which we held that Rule lOb-5's private right of action does not include suits against aiders and abettors. See id., at 180. Such suits — against entities that contribute “substantial assistance” to the making of a statement but do not actually make it — may be brought by the SEC, see 15 U. S. C. § 78t(e), but not by private parties. A broader reading of “make,” including persons or entities without ultimate control over the content of a statement, would substantially undermine Central Bank. If persons or entities without control over the content of a statement could be considered primary violators who “made” the statement, then aiders and abettors would be almost nonexistent.[6]
This interpretation is further supported by our recent decision in Stoneridge. There, investors sued “entities who, acting both as customers and suppliers, agreed to arrangements that allowed the investors’ company to mislead its au *144 ditor and issue a misleading financial statement.” 552 U. S., at 152-153. We held that dismissal of the complaint was proper because the public could not have relied on the entities' undisclosed deceptive acts. Id., at 166-167. Significantly, in reaching that conclusion we emphasized that “nothing [the defendants] did made it necessary or inevitable for [the company] to record the transactions as it did.” Id., at 161.[7] This emphasis suggests the rule we adopt today: that the maker of a statement is the entity with authority over the content of the statement and whether and how to communicate it. Without such authority, it is not “necessary or inevitable” that any falsehood will be contained in the statement.
Our holding also accords with the narrow scope that we must give the implied private right of action. Id., at 167. Although the existence of the private right is now settled, we will not expand liability beyond the person or entity that ultimately has authority over a false statement.
2
The Government contends that “make” should be defined as “create.” Brief for United States as Amicus Curiae 14-15 (citing Webster’s New International Dictionary 1485 (2d ed. 1958) (defining “make” as “[t]o cause to exist, appear, or occur”)). This definition, although perhaps appropriate when “make” is directed at an object unassociated with a verb (e. g., “to make a chair”), fails to capture its meaning when directed at an object expressing the action of a verb.
Adopting the Government’s definition of “make” would also lead to results inconsistent with our precedent. The Government’s definition would permit private plaintiffs *145 to sue a person who “provides the false or misleading information that another person then puts into the statement.” Brief for United States as Amicus Curiae 13.[8] But in Stoneridge, we rejected a private Rule 10b-5 suit against companies involved in deceptive transactions, even when information about those transactions was later incorporated into false public statements. 552 U. S., at 161. We see no reason to treat participating in the drafting of a false statement differently from engaging in deceptive transactions, when each is merely an undisclosed act preceding the decision of an independent entity to make a public statement.
For its part, First Derivative suggests that the “well-recognized and uniquely close relationship between a mutual fund and its investment adviser” should inform our decision. Brief for Respondent 21. It suggests that an investment adviser should generally be understood to be the “maker” of statements by its client mutual fund, like a playwright whose lines are delivered by an actor. We decline this invitation to disregard the corporate form. Although First Derivative and its amici persuasively argue that investment advisers *146 exercise significant influence over their client funds, see Jones v. Harris Associates L. P., 559 U. S. 335, 338 (2010), it is undisputed that the corporate formalities were observed here. JCM and Janus Investment Fund remain legally separate entities, and Janus Investment Fund’s board of trustees was more independent than the statute requires. 15 U. S. C. § 80a-10 (2006 ed.).[9] Any reapportionment of liability in the securities industry in light of the close relationship between investment advisers and mutual funds is properly the responsibility of Congress and not the courts. Moreover, just as with the Government’s theory, First Derivative’s rule would create the broad liability that we rejected in Stoneridge.
Congress also has established liability in § 20(a) for “[ejvery person who, directly or indirectly, controls any person liable” for violations of the securities laws. §78t(a) (2006 ed., Supp. IV). First Derivative’s theory of liability based on a relationship of influence resembles the liability imposed by Congress for control. To adopt First Derivative’s theory would read into Rule 10b-5 a theory of liability similar to — but broader in application than, see post, at 156— what Congress has already created expressly elsewhere.[10] We decline to do so.
B
Under this rule, JCM did not “make” any of the statements in the Janus Investment Fund prospectuses; Janus Invest *147 ment Fund did. Only Janus Investment Fund — not JCM— bears the statutory obligation to file the prospectuses with the SEC. §§77e(b)(2), 80a-8(b), 80a-29(a)-(b); see also 17 CFR .§ 230.497 (imposing requirements on “investment companies”). The SEC has recorded that Janus Investment Fund filed the prospectuses. See JIF Groupl Standalone Prospectuses (Feb. 25, 2002), online at http://www. sec.gov/Archives/edgar/data/277751/000027775102000049/ 0000277751-02-000049.txt (as visited June 10, 2011, and available in Clerk of Court’s case file) (recording the “Filer” of the Janus Mercury Fund prospectus as “Janus Investment Fund”). There is no allegation that JCM in fact filed the prospectuses and falsely attributed them to Janus Investment Fund. Nor did anything on the face of the prospectuses indicate that any statements therein came from JCM rather than Janus Investment Fund — a legally independent entity with its own board of trustees.[11]
First Derivative suggests that both JCM and Janus Investment Fund might have “made” the misleading state *148 ments within the meaning of Rule 10b-5 because JCM was significantly involved in preparing the prospectuses. But this assistance, subject to the ultimate control of Janus Investment Fund, does not mean that JCM “made” any statements in the prospectuses. Although JCM, like a speechwriter, may have assisted Janus Investment Fund with crafting what Janus Investment Fund said in the prospectuses, JCM itself did not “make” those statements for purposes of Rule 10b-5.[12]
* * *
The statements in the Janus Investment Fund prospectuses were made by Janus Investment Fund, not by JCM. Accordingly, First Derivative has not stated a claim against JCM under Rule 10b-5. The judgment of the United States Court of Appeals for the Fourth Circuit is reversed.

It is so ordered.

 Market timing is a trading strategy that exploits timo delay in mutual funds’ daily valuation system. The price for buying or selling shares of a mutual fund is ordinarily determined by the next net asset value (NAV) calculation after the order is placed. The NAV calculation usually happens once a day, at the close of the major U. S. markets. Because of certain time delays, however, the values uood in these calculations do not always accurately reflect the true value of the underlying assets. For example, a fund may value its foreign securities based on the price at the close of the foreign market, which may have occurred several hours boforo the calculation. But events might have taken place after the close of the foreign market that could be expected to affect their price. If the event were expected to increase the price of the foreign securities, a market timing investor could buy shares of a mutual fund at the artificially low NAV and sell the next day when the NAV corrects itself upward. See Disclosure Regarding Market Timing and Selective Disclosure of Portfolio Holdings, 68 Fed. Reg. 70402 (proposed Dec. 17, 2003).

 In 2004, JCG and JCM sottlod thoso allegations and agreed to reduce their fees by $125 million and pay $50 million in civil penalties and $50 million in disgorgement to the mutual fund investors.

 The elements of a private action under Rule 10b-5 are “(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or salo of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.” Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc., 552 U. S. 148, 157 (2008).

 Rule 10b-5 makes it “unlawful for any person, directly or indirectly, by tho ueo of any moans or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, . . . [t]o mako any untrue statement of a material fact or to omit to state a material fact nocoesary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . .” 17 CFR §240.10b-5(b).

 Although First Derivative argued below that JCG violated Rule 10b-5 by making the statements in the prospectuses, it now seeks to hold JCG liable solely as a control person of JCM under § 20(a). The only question we must answer, therefore, is whether JCM made the misstatements. Whether First Derivative has stated a claim against JCG as a control person depends on whether it has stated a claim against JCM.

 Tho disoont eorroetly notes that Central Bank involved secondary, not primary, liability. Post, at 158 (opinion of Breyer, J.). But for Central Bank to have any moaning, there must be some distinction between thoac who aro primarily liable (and thue may be pursued in private suite) and those who aro secondarily liable (and thus may not be pursued in private suits).
We draw a clean line between the two — the maker is the person or entity with ultimate authority over a statement and others are not. In contrast, the dissent’s only limit on primary liability is not much of a limit at all. It would allow for primary liability whenever “[t]he specific rola tionships alleged... warrant [that] conclusion” — whatever that may mean. Post, at 158.

 We agree that "no one in Stoneridge contended thal the equipment suppliers were, in fact, the makers of the cable company's misstatements.” Poots at 166. If Stonoridgo had addrcoood whether the equipment euppli-ero were “makers," today’s decision would be unnecessary. The point is that Stoneridge’s analysis suggests that they were not.

 Because we do not find the meaning of “make” in Rule 10b-5 to be ambiguous, we need not consider the Government’s assertion that we should defer to the SEC's interpretation of the word elsewhere. Brief for United States as Amicus Curiae 13 (citing Brief for SEC as Amicus Curiae in Pacific Inv. Mgmt. Co. LLC v. Mayer Brown LLP, No. 09-1619 (CA2), p. 7); see Christensen v. Harris County, 529 U. S. 576, 588 (2000). We note, howovor, that we have previously expressed skopticiom over the degree to which the SEC should receive deference regarding the private right of action. See Piper v. Chris-Craft Industries, Inc., 430 U. S. 1, 41, n. 27 (1977) (noting that the SEC’s presumed expertise “is of limited value” whan analyzing “whothor a cauoo of action should be implied by judicial interpretation in favor of a particular class of litigants”). This also is not the first time this Court has disagreed with the SEC’s broad view of § 10(b) or Rule 10b-5. See, e. g., Central Bank of Denver, N. A. v. First Interstate Bank of Denver, N. A., 511 U. S. 164, 188-191 (1994); Dirks v. SEC, 463 U. S. 646, 666, n. 27 (1983); Ernst & Ernst v. Hochfelder, 425 U. S. 185, 207 (1976); Blue Chip Stamps v. Manor Drug Stores, 421 U. S. 723, 746, n. 10 (1975).

 Nor does First Derivative contend that any statements made by JCM to Janus Investment Fund were “public statements” for the purposes of Basic Inc. v. Levinson, 485 U. S. 224, 227-228 (1988). We do not address whether and in what eireumstanecD statements would qualify as “public.” Cf. post, at 159 160 (citing cases involving liability for statements mado to analysts); In re Aetna, Inc. Securities Litigation, 617 F. 3d 272, 275-277 (CA3 2010) (involving allegations that defendants “publicly toutfed]” falsities on analyst conference calls).

 We do not address whether Congress created liability for entities that act through innocent intermediaries in 15 U. S. C. § 78t(b). See Tr. of Oral Arg. 6, 61.

 First Derivative suggests that “indirectly” in Rule 10b-5 may broaden the meaning of “make.” We disagree. The phrase “directly or indirectly” is set off by itself in Rule 10b-5 and modifies not just “to make,” but also “to employ” and “to engage.” We think the phrase merely clarifies that as long as a statement is made, it docs not matter whether the statement was communicated directly or indirectly to the recipient. A different understanding of “indirectly” would, like a broad definition of “make,” threaten to erase the line between primary violators and aiders and abettors established by Central Bank.
In this case, wo nood not dofino procisoly what it moans to communicate a “made” statement indirectly because none of the statements in the prospectuses were attributed, explicitly or implicitly, to JCM. Without attribution, there is no indication that Janus Investment Fund was quoting or otherwise repeating a statement originally “made” by JCM. Cf. Anixter v. Home-Stake Production Co., 77 F. 3d 1215, 1220, and n. 4 (CA10 1996) (quoting a signed “ ‘Auditor’s Report’ ” included in a prospectus); Basic, supra, at 227, n. 4 (quoting a newo item reporting a statement by Basic’s presidont), More may bo required to find that a person or entity made a statement indirectly, but attribution is necessary.

 That JCM provided access to Janus Investment Fund’s prospectuses on its Web site is also not a basis for liability. Merely hosting a document on a Web site docs not indicate that the hosting entity adopts the docu ■ ment as its own statement or exercises control over its content. Cf. United States v. Ware, 577 F. 3d 442, 448 (CA2 2009) (involving the issuance of false press releases through innocent companies). In doing so, we do not think JCM made any of the statements in Janus Investment Fund’s prospectuses for purposes of Rule 10b 5 liability, just as wo do not think that the SEC “makes” the statements in the many prospectuses available on its Web site.