In the

# United States Court of Appeals
## For the Seventh Circuit

No. 12-3512

RONALD R. PETERSON, as Trustee for the estates of Lancelot
Investors Fund, Ltd., and Colossus Capital Fund, Ltd.,

*Plaintiff-Appellant*,

*v.*

WINSTON & STRAWN LLP,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 C 2601 — **Matthew F. Kennelly**, *Judge*.

ARGUED APRIL 8, 2013 — DECIDED SEPTEMBER 6, 2013

Before EASTERBROOK, *Chief Judge*, and POSNER and SYKES,
*Circuit Judges*.

EASTERBROOK, *Chief Judge*. Ever since Gregory Bell's mutual funds, known as the Lancelot or Colossus group (collectively "the Funds"), folded in late 2008, their trustee in bankruptcy has been seeking assets from solvent third parties. Last year we considered the Trustee's claims against the Funds' auditor. *Peterson v. McGladrey & Pullen, LLP*, 676 F.3d

594 (7th Cir. 2012). This appeal concerns the Trustee's claim, on behalf of two Funds, against one of their law firms. Other appeals, also decided today, arise from avoidance actions against some of the investors.

The Funds invested most of their money in ventures run by Thomas Petters, who claimed to be operating as a commercial factor—that is, a lender financing other businesses' inventory. A factor advances money to purchase inventory, takes a security interest in the inventory, and is repaid as the inventory is sold. The Funds' offering circulars told their investors that the Funds would verify the inventory's existence and ensure that repayments were made to a "lockbox"—that is, made directly to financial institutions that would ensure the money's proper application.

The Funds did not keep these promises and could not do so, because Petters was running a Ponzi scheme in which new investments were used to pay off older investments rather than to finance an operational business. Petters has been convicted of fraud. *United States v. Petters*, 663 F.3d 375 (8th Cir. 2011). Bell concedes that he learned of, and joined, Petters's scam early in 2008; Bell pleaded guilty to fraud. But both Bell and the Funds' Trustee maintain that until 2008 Bell was ignorant of the Ponzi scheme. The events in question concern years during which, we must assume (because this suit was resolved on the pleadings), Bell honestly if incompetently thought Petters's businesses legitimate.

The Funds hired Winston & Strawn in 2005 to revise their offering circular (the "Confidential Information Memorandum") shown to persons thinking about investing in the Funds. According to the Trustee's complaint, Bell told the law firm that Petters refused to allow the Funds to verify the

existence of inventory and that repayments did not come through lockboxes. The law firm prepared a revised offering circular, which the Funds started using in 2006; this circular, like the 2003 version, represents that the Funds will verify the existence of inventory and ensure that factors use lock-boxes. The Trustee contends that the law firm committed malpractice, but the district court, invoking the doctrine of *in pari delicto*, dismissed the suit after concluding that Bell's knowledge was at least as great as the law firm's. 2012 U.S. Dist. LEXIS 147653 (N.D. Ill. Oct. 10, 2012).

The Trustee has no greater rights against the law firm than the Funds themselves had, and the law firm maintains that the Funds had none because Bell (and thus the Funds) knew as much as the law firm did about Petters's activities. One potential problem with this perspective is that people and corporations often hire law firms for advice about what to do. Suppose we take it as established that Bell had learned of Petters's scheme by 2005. He and the Funds might well have needed to know what should happen next. If a law firm gave incompetent advice, it could not defend by assert-ing that Bell already knew the facts. The fault would not be equal, because Bell would have hired the law firm for legal expertise rather than factual information. Similarly, if Bell had been indicted for securities fraud and supplied a law firm with facts showing that the prosecution was untimely, and the law firm failed to invoke the statute of limitations, it could not defend a malpractice suit by observing that Bell knew all the facts. When the goal of hiring a professional adviser is to cope with the consequences of known facts, the parties' equal access to the facts is beside the point.

Nonetheless, the Trustee's complaint was properly dismissed, because it does not plausibly allege that the law firm violated any duty to the Funds. The Trustee does not contend that Winston & Strawn should have provided better, or even different, legal advice. Instead he contends that it should have done two things on learning that Petters would not allow verification of inventory and did not use a lockbox: The law firm should have alerted the Funds' directors and should have revealed the truth in the 2006 offering circular.

The latter step would not have offered a benefit to the Funds (as opposed to their investors); to the contrary, it probably would have precipitated the Funds' immediate collapse. The Trustee has stepped into the shoes of the Funds, *not* of their investors, who may (or may not) have independent claims based on the contents of the 2006 circular. Lancelot Investors Fund and Lancelot Investment Management (of which Bell was the sole principal) issued that circular and thus vouched for the truth of the statements it contained. Winston & Strawn did not sign the document or warrant the truth of its contents. Cf. *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011) (discussing who is responsible for statements in documents used to sell securities). As administrator of the Funds' estate, the Trustee is in no position to collect from the law firm on the theory that factual representations in the 2006 circular were false, when the Funds represented them to be true.

As for the Trustee's assertion that the law firm should have alerted the Funds' directors, the initial problem is that the law firm was not hired to blow the whistle on Bell, and the Trustee does not identify any rule of Illinois law (which

governs here) treating failure to do so as a tort. The SEC's rules sometimes require disclosure or "noisy withdrawal," but the Funds were established in the Cayman Islands, and the Trustee does not contend that federal law governs the law firm's responsibilities. Rule 1.13 of the Illinois Rules of Professional Responsibility, which does apply (because the law firm rendered its services in Illinois), sometimes requires a lawyer to report to the highest corporate authority—which may well have been Bell, but we'll assume that the board is a higher authority. And we can assume, without deciding, that Rule 1.13 required the law firm to do more than it did. The problem for the Trustee is that no court in Illinois has held that failure to report a corporate manager's acts to the board of directors exposes a law firm to damages for malpractice. Rules of professional conduct are enforced through the disciplinary mechanism rather than by awards of damages. The Trustee does not argue otherwise.

Nor does the complaint plausibly allege that alerting the directors would have made a difference. The offering circular says that the four directors appointed Bell's firm, Lancelot Investment Management, to be responsible for conducting all of the Funds' investment-management operations. Thus Bell was as firmly in charge of the Funds as he was of his advisory firm—and we said exactly that in *McGladrey & Pullen* when holding that anything Bell knew, the Funds knew. 676 F.3d at 596. *McGladrey & Pullen* rejects the Trustee's argument that Bell's knowledge should not be imputed to the Funds because he was acting adversely to their interests. *Id.* at 599. The Trustee repeats that argument, which fares no better the second time.

One of the four directors lived in Hong Kong and the other three in the Bahamas. Nothing in the complaint suggests that any of the four ever exercised any responsibility over the Funds other than to delegate all powers and duties to Bell. The Trustee might have bolstered his claim by conducting an investigation into the four directors' careers and learning how they had responded if or when other firms with which they were affiliated had encountered troubled investments or balky borrowers (Petters's ventures fit both descriptions). But the Trustee conceded at oral argument that he had not conducted any pre-filing investigation, and he did not ask for discovery in order to learn whether the directors were independent of Bell in any realistic sense.

That is equally true with respect to the "loan acquisition officer," a position that the 2006 circular said would be created. The Trustee does not know whether the job was filled—or, if it was, what the incumbent learned from Bell or Petters—and seems remarkably uncurious about those subjects. This makes it hard to advance a plausible claim that the law firm had a duty to bypass Bell and present the facts about Petters to the "loan acquisition officer."

The complaint and briefs stop with the assertion that the directors had a legal duty to ride herd on Bell and thus would have done so. That may be a correct statement of their duties, but the Trustee has not offered anything to make plausible a contention that the directors would have fulfilled them, even if the law firm had a duty to bypass Bell. Given the plausibility standard added to federal pleading law by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), this complaint was properly dismissed.

AFFIRMED